## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARGARET CARROLL, On Behalf Of Herself And All Others Similarly Situated, | Civil Action: 08-CV-8659 (DAB) (HP) |
| Plaintiff, | |
| vs. | |
| AMERICAN INTERNATIONAL GROUP, INC., CITIGROUP GLOBAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED (*now known as* MERRILL LYNCH & CO., INC.),  MORGAN STANLEY & CO. INCORPORATED, UBS SECURITIES, LLC, WACHOVIA CAPITAL MARKETS, LLC, BANC OF AMERICA SECURITIES LLC, BEAR, STEARNS & CO. INC., THE BEAR STEARNS COMPANIES LLC, RBC CAPITAL MARKETS, WELLS FARGO SECURITIES, MARTIN J. SULLIVAN, STEVEN J. BENSINGER, MARSHALL A. COHEN, MARTIN S. FELDSTEIN, ELLEN V. FUTTER, STEPHEN L. HAMMERMAN,  RICHARD C. HOLBROOKE, FRED H. LANGHAMMER, GEORGE L. MILES, JR., MORRIS W. OFFIT, JAMES F. ORR III, VIRGINIA M. ROMETTY, MICHAEL H. SUTTON, EDMUND S.W. TSE, ROBERT B. WILLUMSTAD, FRANK G. ZARB and DAVID L. HERZOG, | JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all other persons similarly situated (the "Class"), by Plaintiff's undersigned attorneys, makes the following allegations on information and belief based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiff and Plaintiff's counsel which are based on personal knowledge.  The investigation conducted by Plaintiff's counsel included, *inter alia*, a review and analysis of: (i) publicly-available news articles

and reports; (ii) public filings including, but not limited to, American International Group, Inc. ("AIG" or the "Company") Securities and Exchange Commission ("SEC") filings and prospectuses; (iii) securities analysts' reports and advisories about the Company; and (iv) press releases issued by Defendants.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      This is a securities class action filed on behalf of purchasers of 7.70% Series A-5 Junior Subordinated Debentures ("AVF") from the date of the Company's public offering on December 11, 2007 (the "Offering" or "Prospectus"), and all purchasers traceable thereto (the "Class Period").  These claims are brought against AIG, certain of its officers and directors, and the underwriters of the AIG Offering (collectively, "Defendants") for violations of the federal securities laws in connection with the Offering.

2.      This action arises under Sections 11, 12(a)(2), 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, which imposes liability on a company's directors and officers, among others, for failure to craft a registration statement and prospectus that fully and accurately informs investors of all material facts and industry trends affecting the issuer company.   The issuer itself is held strictly liable for any material misrepresentations or omissions found in its Prospectus.  Additionally, every person in a position of control over the issuer is held liable.

3.      This Complaint asserts that AIG's Prospectus, which specifically incorporated by reference the Company's annual report on Form 10-K for the fiscal year ended December 31, 2006 ("2006 Form 10-K") and the Company's quarterly Report on Form 10-Q for the quarterly period ended March 31, 2007 ("2007 Q1 Form 10-Q"), contained both material misstatements

and omissions, which Plaintiff and the Class relied upon to their detriment.  The representations made in the Company's Prospectus were materially false and misleading because at the time of the Offering, AIG was already suffering from several adverse factors that were not revealed and/or adequately addressed in the Prospectus.  These factors include, but are not limited to, the fact that, contrary to representations in the Prospectus: (i) AIG did not have a relatively small exposure to loss associated with credit swaps sold by certain variable interest entities; (ii) AIG's exposure to loss associated with credit protection assumed by AIG Financial Products Corp. and AIG Trading Group Inc., including their respective subsidiaries ("AIGFP") on portfolios of loans or debt securities was not "remote, even in severe recessionary market scenarios"; and (iii) AIG's financial statements and financial information, as contained in and incorporated by reference into the Prospectus, were not presented in conformity with generally accepted accounting principles ("GAAP").

4.       The Defendants could have -- and should have -- discovered the material misstatements and omissions in the Company's Prospectus prior to its filing with the SEC and distribution to the investing public.  Instead, they failed to do so.

5.       Plaintiff and the Class have suffered serious financial damage as a result of Defendants' material misstatements and omissions in the Company's Prospectus, and bring this action to recover damages incurred thereby as well as the costs and expenses of this litigation and any further relief as may be just and proper.

## JURISDICTION AND VENUE

6.       The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), 15 of the Securities Act, 15 U.S.C. §§ 77k , 77l(a)(2) and 77o.

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).

8.      Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391(b), because many of the alleged acts, transactions, and conduct constituting violations of law, including the issuance and dissemination of materially false and misleading information to the investing public, occurred, at least in part, in this District. Additionally, Defendants reside, maintain their headquarters or conduct substantial business in this District.

9.      In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### The Plaintiff

10.     Plaintiff Margaret Carroll purchased 7.70% Series A-5 Junior Subordinated Debentures pursuant or traceable to the Offering, as shown on the attached Certification, and was damaged thereby.

### The Company Defendant

11.     Defendant AIG, a Delaware corporation, is a holding company which, through its subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad.  AIG's primary activities include both General Insurance and Life Insurance & Retirement Services operations.  Its principal executive offices are located at 70 Pine Street, New York, New York 10270.

**The Underwriter Defendants**

12.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a successor to Salomon Smith Barney and a subsidiary of Citigroup Inc, a Delaware corporation that is headquartered at 388 Greenwich Street, New York, New York 10013.   Citigroup was an underwriter of the Offering.

13.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated (*now know as Merrill Lynch & Co., Inc.*) ("Merrill") was an underwriter of the Offering.   Merrill is headquartered at 4 World Financial Center, 250 Vesey Street, New York, New York 10080.

14.     Defendant Morgan Stanley & Co. Incorporated ("Morgan") was an underwriter of the Offering.  Morgan is headquartered at 1585 Broadway, New York, NY 10036.

15.     Defendant UBS Securities LLC ("UBS") is a subsidiary of UBS AG, a Swiss corporation headquartered at Bahnhofstrasse 45, Zurich, Switzerland, and Aeschenvorstadt 1, Basel, Switzerland.  UBS is headquartered in Stamford, Connecticut.  UBS was an underwriter of the Offering.

16.     Defendant Wachovia Capital Markets, LLC ("Wachovia") is headquartered at 301 S. College St. Charlotte, NC 28288.  Wachovia was an underwriter of the Offering.

17.     Defendant Banc of America Securities LLC ("Banc of America") is a subsidiary of Banc of America Corp, a Delaware Corporation that is headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255.  Banc of America was an underwriter of the Offering.

18.     Defendant Bear, Stearns & Co. Inc. was an underwriter of the Offering.   On March 17, 2008, Bear Stearns Cos. was subsumed by JPMorgan Chase.  Upon information and belief, Bear, Stearns & Co., Inc. also conducts business under the name of The Bear Stearns

Companies, LLC.   Bear, Stearns & Co. Inc. and The Bear Stearns Companies, LLC are collectively referred to herein as "Bear Stearns".

19.   Defendant RBC Capital Markets ("RBC") was an underwriter of the Offering. RBC is located at One Liberty Plaza, 165 Broadway, New York, NY.

20.   Defendant Wells Fargo Securities ("Wells Fargo") was an underwriter of the Offering.  Wells Fargo is headquartered at 600 California Street, Suite 1600 San Francisco, CA 94108-2704.

21.   Defendants Citigroup, Merrill, Morgan, UBS, Wachovia, Banc of America, Bear Stearns, RBC, and Wells Fargo are collectively referred to hereinafter as the "Underwriter Defendants."

**The Officer and Director Defendants**

22.   Defendant Martin J. Sullivan ("Sullivan") was AIG's President, Chief Executive Officer and a Director at the time of the Offering.  Defendant Sullivan signed the Form S-3 Registration Statement, dated June 22, 2007 (the "Registration Statement") for the Offering.

23.   Defendant David L. Herzog ("Herzog") was AIG's Senior Vice President and a Comptroller at the time of the Offering.  Defendant Herzog signed the Registration Statement for the Offering.

24.   Defendant Marshall A. Cohen ("Cohen") was an AIG Director at the time of the Offering.  Defendant Cohen signed the Registration Statement for the Offering.

25.   Defendant Martin S. Feldstein ("Feldstein") was an AIG Director at the time of the Offering.  Defendant Feldstein signed the Registration Statement for the Offering.

26.   Defendant Ellen V. Futter ("Futter") was an AIG Director at the time of the offering.  Defendant Futter signed the Registration Statement for the Offering.

27.     Defendant Stephen L. Hammerman ("Hammerman") was an AIG Director at the time of the Offering.  Defendant Hammerman signed the Registration Statement for the Offering.

28.     Defendant Richard C. Holbrooke ("Holbrooke") was an AIG Director at the time of the Offering.  Defendant Holbrooke signed the Registration Statement for the Offering.

29.     Defendant Fred H. Langhammer ("Langhammer") was an AIG Director at the time of the Offering.  Defendant Langhammer signed the Registration Statement for the Offering.

30.     Defendant George L. Miles, Jr. ("Miles") was an AIG Director at the time of the Offering.  Defendant Miles signed the Registration Statement for the Offering.

31.     Defendant Morris W. Offit ("Offit") was an AIG Director at the time of the Offering.  Defendant Offit signed the Registration Statement for the Offering.

32.     Defendant James F. Orr, III ("Orr") was an AIG Director at the time of the Offering.  Defendant Orr signed the Registration Statement for the Offering.

33.     Defendant Virginia M. Rometty ("Rometty") was an AIG Director at the time of the Offering.  Defendant Rometty signed the Registration Statement for the Offering.

34.     Defendant Michael H. Sutton ("M. Sutton") was an AIG Director at the time of the Offering.  Defendant M. Sutton signed the Registration Statement for the Offering.

35.     Defendant Edmund S.W. Tse ("Tse") was an AIG Director at the time of the Offering.  Defendant Tse signed the Registration Statement for the Offering.

36.     Defendant Robert B. Willumstad ("Willumstad") was an AIG Director at the time of the Offering.  Defendant Willumstad signed the Registration Statement for the Offering.

37.     Defendant Frank G. Zarb ("Zarb") was an AIG Director at the time of the Offering.  Defendant Zarb signed the Registration Statement for the Offering.

38.     Defendant Steven J. Bensinger ("Bensinger") was AIG's Executive Vice President and Chief Financial Officer at the time of the Offering.   Defendant Bensinger signed the Registration Statement for the Offering.

39.     Defendants Sullivan, Herzog, Cohen, Feldstein, Futter, Hammerman, Holbrooke, Langhammer, Miles, Offit, Orr, Rometty, Sutton, Tse, Willumstad, Zarb and Bensinger are collectively referred to hereinafter as the "Individual Defendants."

40.     Each of the individuals named in paragraphs 22-38 and each of the defendants named in paragraphs 12-20 (the "Underwriter Defendants") participated in the drafting, preparation, or approval of various false and misleading statements contained in the Registration Statement/Prospectus in connection with the Offering, as complained of herein.   Each of the defendants was responsible for ensuring the truth and accuracy of the statements contained in the Registration Statement/Prospectus in connection with the Offering.

41.     Each of the defendants, owed to the purchasers, including Plaintiff and the Class (defined below), the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement/Prospectus at the time it became effective.   This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material fact required to be stated in order to make the statements contained in the Registration Statement/Prospectus not misleading.   As herein alleged, each of the defendants violated these specific duties and obligations.   As a result of these violations, the market price of 7.70% Series A-5 Junior Subordinated Debentures was artificially inflated, causing injury to Plaintiff and the Class.

## **SUMMARY**

42.     On June 22, 2007, AIG filed a Registration Statement with the SEC, indicating its intent to float a public offering for the Company's 7.70% Series A-5 Junior Subordinated Debentures.

43.     On or about December 11, 2007, AIG filed its prospectus supplement announcing the terms of the 7.70% Series A-5 Junior Subordinated Debentures to be issued pursuant to the previously filed Registration Statement.   The prospectus supplement stated AIG intended to sell $1,000,000,000 7.70% Series A-5 Junior Subordinated Debentures.   These 7.70% Series A-5 Junior Subordinated Debentures trade on the New York Stock Exchange under the ticker symbol "AVF."

44.     The rewards that Defendants reaped in connection with the Offering were unlawfully obtained because Defendants violated Section 11, 12(a)(2) and 15 of the Securities Act.   Under Section 11, directors and officers, among others, are liable for failure to issue a prospectus which fully and accurately informs investors of all material facts and industry trends affecting the Company.   The Company is held strictly liable for any material misrepresentations or omissions from the Prospectus.   A key policy underlying Section 11 liability is to enable prospective investors, like Plaintiff and the Class, to make informed investment decisions based on the disclosure of adequate and truthful information regarding the issuer, its associated persons, and the offering.   This policy is frustrated when a prospectus contains materially false and misleading statements.

45.     The Prospectus was materially false and misleading because it failed to reveal the Company's significant exposure to the subprime market as the largest underwriter of U.S. mortgage bonds.   The Prospectus also failed to disclose that as a result of the deteriorating

market conditions and rapidly declining asset values, AIG was in desperate need for capital and at substantial risk of failing as a going-concern.

46.    The Prospectus materially misrepresented the risks associated with investing in the Company's 7.70% Series A-5 Junior Subordinated Debentures.  Markedly missing from the disclosures in the "Risk Factors" section of the Prospectus was any reference to the effect the down market could have on its financial position or the price of its securities based upon the Company's business operations.  Nor did the Company disclose that its commercial and residential mortgage and real estate assets were overvalued by billions of dollars.  Had Defendants conducted a proper and adequate due diligence investigation, they would have realized the effect caused by the softening mortgage market and weakening credit market.

47.    At the time of the Offering, AIG was aware of these problems and was not taking proactive steps to lower its exposure or to disclose the risks to investors.  The market volatility was adversely and materially damaging AIG's business as a result of its aggressive pursuit of the mortgage backed underwriting business and would inevitably adversely affect the Company's business on a going-forward basis.

48.    By mid September 2008, AIG had taken a billion dollars in write-downs associated with the AIGFP super senior credit default swap portfolio and was teetering on the verge of bankruptcy.  As a result, the price of the 7.70% Series A-5 Junior Subordinated Debentures decreased to one fifth the price which Plaintiff paid earlier.

## CLASS ACTION ALLEGATIONS

49.    Plaintiff brings this action individually and on behalf of a Class of purchasers of 7.70% Series A-5 Junior Subordinated Debentures issued pursuant and/or traceable to the Company's December 11, 2007 Offering.  Excluded from the Class are Defendants, members of

the immediate families of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded.

50.     The members of the Class are so numerous that joinder of all members is impracticable.   According to information contained in a December 18, 2007 Form 8-K, approximately $1,100,000,000 of the Company's 7.70% Series A-5 Junior Subordinated Debentures were sold in the Offering.   The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands.   In addition, the names and addresses of the Class members can be ascertained from the books and records of AIG or its transfer agent or the underwriters for the Offering.   Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions.

51.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.   Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and to prosecute this action vigorously.

52.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all of the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.   Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the

Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     Whether the Prospectus issued by Defendants to the investing public omitted and/or misrepresented material facts about AIG and its business; and

(c)     The extent of injuries sustained by the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

55.     AIGFP engages in various credit default swap agreements. A credit default swap is an instrument which transfers the credit risk of a fixed income investment product. It is effected through a bilateral contract in which two counterparties agree to isolate and separately trade the credit risk of at least one third-party entity. The buyer of a credit swap receives credit protection and the seller guarantees the credit worthiness of the third-party entity's product. In this regard, a credit default swap is similar to an insurance policy. It is treated as a derivative because its price and value derives from the credit worthiness of the obligations of the third party entity.

56.     In certain cases, the credit risk associated with a designated investment portfolio (i.e., a portfolio of collateralized debt obligations) is tranched into different layers of risk, which are then analyzed and rated by the credit rating agencies. Typically, there will be a layer covering

the first credit losses in respect of the portfolio up to a specified percentage of the total portfolio, and then successive layers that are rated, generally a BBB-rated layer, an A-rated layer, an AA-rated layer, and an AAA-rated layer.

57.     According to AIG, in transactions that were rated, the risk layer or tranche that was immediately junior to the threshold level above, which AIGFP's payment obligation would generally arise, was rated AAA by the rating agencies.  In transactions that were not rated, AIGFP purportedly applied the same risk criteria for setting the threshold level for its payment obligations.  Therefore, the risk layer assumed by AIGFP with respect to the designated portfolio in these transactions was referred to by AIGFP as the "super senior" risk layer, defined as the layer of credit risk senior to a risk layer that was rated AAA by the credit rating agencies or if the transaction was not rated, equivalent thereto.  See AIG 2006 Form 10-K, as incorporated by reference into the Prospectus, p. 95.

58.     Pursuant to the terms of its super senior credit derivative agreements, AIGFP (through its credit default swap agreements) essentially guaranteed the credit worthiness of the underlying investment (such as collateralized debt obligations, or CDOs), thereby transferring the risk of default from the investor to AIGFP.

59.     On March 1, 2007, after the markets closed, AIG filed its 2006 Form 10-K with the SEC. This document, which was incorporated into the Prospectus by reference, led the investment community to believe that:

       (a)     AIG was a buyer of credit protection; that AIG used credit default swaps to hedge against losses in its securities available for sale portfolio ("If its [the Company's] securities available for sale portfolio were to suffer significant default and the collateral held declined significantly in value with no replacement or the credit default swap

counterparty failed to perform, AIGFP could have a liquidity strain."). <u>See</u> 2006 Form 10-K, at p. 83;

      (b)     AIG had a relatively small exposure to loss associated with credit swaps sold by certain variable interest entities ("Assets of VIEs where AIG has a significant variable interest and does not consolidate the VIE because AIG is not the primary beneficiary, approximated at $130.1 billion December 31, 2006. Although expected losses are not expected to be material, AIG's maximum exposure to loss from its involvement with these unconsolidated VIEs approximates $38.7 billion at December 31, 2006.  For this purpose, maximum loss is considered to be the notional amount of credit lines, guarantees and other credit support, and liquidity facilities, the notional amounts of credit default swaps and certain total return swaps, and the amount invested in the debt or equity issued by the VIE."). <u>See</u> 2006 Form 10-K, at pp. 164-65;

      (c)     Although AIG sold credit protection on a designated portfolio of loans or debt securities, "[t]he threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios." <u>See</u> 2006 Form 10-K, at p. 94.

60.    The 2006 Form 10-K (incorporated into the Prospectus) was materially false and misleading because it failed to disclose that, as later revealed:

      (a)     AIGFP was a provider of credit protection through default swaps on certain super senior tranches of collateralized debt obligations.  <u>See</u> 2007 Form 10-K, p. 30;

(b)     AIGFP was a provider of credit protection on the diversified portfolios of investment grade corporate debt and collateralized loan obligations.  <u>See</u> 2007 Form 10-K, p. 122;

(c)     There existed a material weakness relating to the internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio.  <u>See</u> 2007 Form 10-K, p. 19; and

(d)     Certain of the credit default swaps written by AIGFP contained collateral posting requirements whereby the amount of the collateral was to be determined based on the value of the security or loan referenced in the documentation for the credit default swap.  <u>See</u> 2007 Form 10-K, p. 17.

61.     The 2006 Form 10-K was also materially false and misleading because the statement that "the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios" was not true.  As later revealed, AIG had several hundred billion in notional exposure on AIGFP's super senior credit default swap portfolio as of December 31, 2006.  <u>See</u> 2007 Form 10-K, p. 33.

62.     Statement of Position 94-6, Disclosure of Certain Significant Risks and Uncertainties ("SOP 94-6"), was issued by the American Institute Of Certified Public Accountants in December 1994.  It requires financial statements to disclose information sufficient to inform the financial statement reader of any vulnerabilities arising due to the fact that the business is exposed to certain risks that might have a "severe impact" (defined in SOP 94-6 as:

> "A significant financially disruptive effect on the normal functioning of the entity".  Among other things, it requires disclosure of information that is adequate to inform users of financial statements of the nature of the company's operations and 'the general nature of the risk associated with concentrations.'"

63.     The Company's financial statements, which were included in the 2006 Form 10-K (and also incorporated by reference into the Prospectus) were materially false and misleading because they failed to comply with the disclosure provisions of Statement of Position 94-6.  In particular, these financial statements failed to disclose:

(a)     the nature of the Company's activities although they were required to include a description of the major products or services the reporting entity sells or provides.

(b)     the general nature of the risk associated with concentrations in the volume of business transacted with insurance counterparties to credit default swap agreements.

64.     On May 10, 2007, AIG filed its 2007 first quarter Form 10-Q with the SEC.  This document was incorporated by reference into the Prospectus.

65.     The 2007 first quarter Form 10-Q was silent regarding AIG's credit default swaps, although it incorporated AIG's 2006 Form 10-K by reference ("These unaudited condensed consolidated financial statements . . . should be read in conjunction with the audited consolidated financial statements and the related notes included in the Annual Report on Form 10-K of American International Group, Inc. (AIG) for the year ended December 31, 2006").

66.     Because it incorporated AIG's 2006 Form 10-K by reference, the 2007 first quarter Form 10-Q was materially false and misleading for the same reasons that the 2006 Form 10-K was materially false and misleading, as specified above.

67.     On August 8, 2007, AIG issued a press release in which Defendant Sullivan stated: "We continue to be very comfortable with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities."

68.     On August 9, 2007, during a conference call with investors and analysts, Defendant Sullivan stated: "AIG's Financial Products portfolio of super senior credit default swaps is well structured; undergoes ongoing monitoring, modeling, and analysis; and enjoys significant protection from collateral subordination."

69.     Based upon other dialogue during the August 9, 2007 conference call, the <u>Wall Street Journal</u> published an article on August 13, 2007 which stated:

> ***Exotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to bankers to insurers. But not at American International Group Inc. -- or so its executives say.*** The insurance giant did its best to reassure markets late last week that it wasn't going to get slammed by the crisis gripping mortgage and debt markets. Although AIG sees mortgage delinquencies rising executives said during an earnings conference call that the bulk of its mortgage insurance and residential loans aren't at risk. The company also said it didn't see problems related to a kind of insurance contract, or derivative, it has written against financial instruments that include some subprime debt.  AIG based its all-clear signal for those derivatives on the fact that its internal models show that losses are extremely remote in the portions of the investment vehicles it's insuring.  ***No likely loses means no reason to worry, the company reasoned . . . .***  Stock analysts seem satisfied by the Company's response that there isn't a problem.

(Emphasis added).

70.     On November 7, 2007, AIG issued a press release, which quoted Defendant Sullivan as stating: "AIGFP reported an operating loss in the quarter due principally to the unrealized market valuation loss related to its super senior credit default swap portfolio. Although GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that it is highly unlikely that AIGFP will be required to make any payments with respect to these derivatives."

71.     On November 7, 2007, the Company filed its 2007 third quarter Form 10-Q with

the SEC.  It stated in relevant part:

> The ongoing disruption in the structured finance markets and *the*
> *recent downgrades by rating agencies continue to adversely*
> *affect AIG's estimates of the fair value of the super senior credit*
> *derivatives written by AIGFP*.   Although it remains difficult to
> estimate the fair value of these derivatives due to continuing
> limitations on the availability of market observable data, *AIG's best*
> *estimate of the further decline in the fair value of AIGFP's super*
> *senior credit derivatives since September 30, 2007 is*
> *approximately $550 million as of October 31, 2007.*
>
> *          *          *
>
> The valuation of the super senior credit derivatives has become
> increasingly challenging given the limitation on the availability of
> market observable information due to the lack of trading and price
> transparency in the structured finance market. These market
> conditions have increased the reliance on management estimates
> and judgments in arriving at an estimate of fair value for financial
> reporting purposes. *Further, disparities in the valuation*
> *methodologies employed by market participants and the varying*
> *judgments reached by such participants when assessing volatile*
> *markets has increased the likelihood that the various parties to*
> *these instruments may arrive at significantly different estimates*
> *as to their fair values*.

(Emphasis added).

72.     The 2007 third quarter Form 10-Q also stated that "as of October 31, 2007, AIG

is aware that estimates made by certain AIGFP counterparties with respect to the fair value of

certain AIGFP super senior credit default swaps and the collateral required in connection with

such instruments differ significantly from AIGFP's estimates."   See AIG 2007 Third Quarter

Form 10-Q, p. 70.

73.     In other words, as of October 31, 2007, there were disputes between AIG and its

counterparties over the values of investments, which were the subject of various super senior

credit default swaps and, therefore, there were disputes over collateral call requirements.

74.     The admitted subjectivity in the Company's valuation methodologies and the fact that counterparties (sophisticated financial institutions) were arriving at "significantly" different valuations was a glaring red flag indicating that something might be wrong with AIG's valuations, and it cried out for an investigation.

75.     However, instead of investigating the basis for the differences, Defendants ignored them.  Had Defendants undertaken even the most cursory due diligence, they would have learned that there existed "a material weakness relating to the internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio."  See 2007 Form 10-K, p. 19.

76.     During the Company's third quarter conference call, Defendant Sullivan reiterated: "AIG does not expect to pay any losses on this carefully structured and well-managed portfolio. All Super Senior transactions are written to a zero loss standard; underlying collateral assets analyze the model to determine appropriate risk attachment points to that all transactions have significant subordination below AIGFP's attachment point."

77.     On December 7, 2007, only days before the Offering, AIG filed a Form 8-K/A with the SEC which stated:

> On December 5, 2007, American International Group, Inc. (AIG) held an investor meeting to discuss its exposures to the U.S. residential mortgage market in greater detail. AIG provided this additional information about its results prior to its fourth quarter earnings announcement date in light of the extreme market conditions in the last two months.  AIG expects that market conditions will continue to evolve, and that the fair value of AIG's positions, and its expectations with respect to its consumer finance and mortgage guaranty operations, will frequently change.  Given these anticipated fluctuations, AIG does not intend to update any financial information until it announces its fourth quarter 2007 earnings. Investors also should not expect AIG to provide

information about the results of future quarters in advance of scheduled quarterly earnings announcement dates.

The effect on AIG's financial results for the fourth quarter from changes in the fair value of its super senior credit default swap portfolio and its investment portfolio, as well as the results from its consumer finance and mortgage guaranty operations, will depend on future market developments that are difficult to predict in this volatile market environment and could differ significantly from the amounts previously disclosed. There are a number of factors that could cause results to change over time, including further deterioration in the sub-prime mortgage market, further declines in home values and interest rate increases.

During its presentation, AIG provided updated information with respect to valuations of the super senior credit derivative portfolio of AIG Financial Products Corp. and AIG Trading Group Inc., including their respective subsidiaries (collectively, AIGFP) and AIG's Residential Mortgage-Backed Securities (RMBS) investment portfolio.

AIG noted that the ongoing disruption in the structured finance markets and the recent downgrades by rating agencies continue to adversely affect AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP. Although it remains difficult to estimate the fair value of these derivatives due to continuing limitations on the availability of market observable data, AIG's best estimate of the further decline in the fair value of AIGFP's super senior credit derivatives since October 31, 2007 is approximately $500 million to $600 million as of November 30, 2007, or an aggregate of approximately $1.05 billion to $1.15 billion since September 30, 2007. The fair value of these derivatives is expected to fluctuate, perhaps materially, in response to changing market conditions, and AIG's estimates of the value of AIGFP's super senior credit derivative portfolio at future dates could therefore be materially different from current estimates. AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives.

78.     At the time of filing of the December 7, 2007 Form 8-K/A there existed continuing significant differences between the valuations of super senior credit default swaps assigned by counterparties and the valuations assigned by AIG, and there were disputes over AIG's required pledging of collateral related thereto.

79.     Once again, the admitted subjectivity in the Company's valuation methodologies and the fact that counterparties (sophisticated financial institutions) were arriving at "significantly" different valuations was a glaring red flag indicating that something might be wrong with AIG's valuations, and it cried out for an investigation.

80.     However, once again (with only days until the Offering), instead of undertaking a serious due diligence and investigating the basis for the differences, Defendants ignored the red flag.

81.     Included in both the full year and fourth quarter 2007 net income (loss) and adjusted net income (loss) were charges of approximately $11.47 billion pretax ($7.46 billion after tax) and $11.12 billion pretax ($7.23 billion after tax), respectively, for a net unrealized market valuation loss related to the AIGFP super senior credit default swap portfolio.

82.     On September 12, 2008, CNN Money published an Associated Press article, "AIG in freefall", which described the reason for a sharp decline in AIG's securities as follows:

> Shares of American International Group Inc. declined further Friday over continuing concerns about whether the world's largest insurer has adequate capital reserves . . . .  Worries about AIG's financial position intensified after being hit hard by deterioration in the credit markets amid worries that complex, structured investments it insures will increasingly default.
>
> Citi Investment Research analyst Joshua Shanker on Friday lowered his price target on the insurer to $25.50 from $40 to reflect current market conditions.
>
> "Marketplace fear of financial institution collapse is rampant," Shanker wrote in a note to clients.  "This is causing severe anxiety over the financial condition of AIG, whose stock is under pressure." The stock has lost nearly 50% of its value in the past week alone.
>
> Credit-ratings agency Standard & Poor's Ratings Services put ratings of AIG on CreditWatch with negative implications, saying the action follows a "significant" decline in AIG's share price and an increase in credit spreads on the company's debt.

Investors remain concerned about whether AIG has adequate capital reserves. Some on Wall Street have called for AIG, which operates a wide range of businesses across 130 countries, to break up its substantial assets, either through sales or by creating third-party investment vehicles.

Over the past three quarters, AIG has lost about $25 billion in the value of credit default swaps -- or default protection for bondholders - and about $15 billion on other investments.

Executives say they believe actual, realized losses will end up being much smaller.

Since the company reported earnings on Aug. 6, the stock has fallen 58%.

83.   On September 15, 2008, the <u>New York Times</u> published an article, "A Race for

Cash at A.I.G. as Ratings Are Downgraded", which stated:

Major credit ratings agencies downgraded the American International Group late Monday, worsening its financial health, as Federal Reserve officials and two leading investment banks were in urgent talks to put together a $75 billion line of credit to stave off a crisis at the company.

The credit downgrades are likely to force the company to turn over billions of dollars in collateral to its derivatives trading partners.

Without the financing, which was being arranged by Goldman Sachs and JPMorgan Chase in talks with the Federal Reserve officials, A.I.G. might be forced to declare bankruptcy, according to two people briefed on the situation.

The talks, which began last week and continued through the weekend, added to the sense of agitation in the stock market on Monday, as investors grappled with the implications of the bankruptcy of Lehman Brothers, which, like A.I.G., was a large counterparty to derivatives contracts held by countless financial institutions.

Shares in A.I.G. tumbled more than 60 percent on Monday morning as concerns grew that the firm lacked capital to withstand cuts to its debt rating, which were borne out later in the day. The company's potential write-offs are mounting and may reach $60 billion to $70 billion, according to two people briefed on the situation.

Most of A.I.G.'s businesses are healthy, but its troubles grew from one unit that dealt in complex debt securities and derivatives and

now threatens to drain cash more quickly than the financing package can be assembled.

The day started off with news that A.I.G. had requested a $40 billion bridge loan from the Fed, a request that was rebuffed, and ended with the word that its need had soared to $75 billion. The firm suffered several credit-rating downgrades Monday evening, including cuts by Standard & Poor's and Moody's.

The complex discussions, continuing into the night as a deal was sought before United States markets open on Tuesday, involved New York state regulators, federal regulators, private equity firms and Wall Street banks that rely on A.I.G.'s ability to honor its derivatives contracts, as they do with Lehman Brothers.

"It's not just the failure of one company," said Julie A. Grandstaff, vice president and managing director of StanCorp Investment Advisers. "It's the ripple effect of the disappearance of counterparties" that was spurring urgent efforts to bolster A.I.G.

A large counterparty to derivatives contracts has not declared bankruptcy since the market grew to such enormous size, so Lehman will be a test. Financial officials fear another failure of a big counterparty could start a chain reaction.

The need to find fresh money for A.I.G. is bringing new layers of complexity to the credit crisis. As an insurance concern, A.I.G. has wholly different regulators and capital requirements than the banks and Wall Street firms that have suffered most of the huge losses so far. One person briefed on the matter said that potential lenders doubted that the facility could come together without the Fed's backing.

A.I.G. itself has had three chief executives in the last three and a half years, and one person briefed on Monday's discussions said its officials seemed uncertain about how to proceed. The Fed was not able to provide the $40 billion bridge loan because it oversees banks, not insurers.

The talks about backing up A.I.G. began last week, when the company approached regulators, saying it was concerned that if a deal could not be put together to save Lehman, A.I.G.'s own future would be in doubt. A.I.G., through its financial products unit in London, has exposure to the same mortgage-linked debt securities that brought about the downfall of Lehman.

The talks between A.I.G. and its regulators led to the announcement at midday by Gov. David A. Paterson of New York that the state would allow A.I.G. to borrow $20 billion from its

own subsidiaries, to help bolster its capital in the face of potentially disastrous credit downgrades.

Mr. Paterson said he had authorized the state insurance superintendent, Eric R. Dinallo, to include the $20 billion asset transfer in the broader plan being worked out at the New York Fed.

Normally state insurance regulations would prevent a holding company like A.I.G. from pulling assets out of its subsidiaries, which are insurance companies that need sufficient liquid resources to pay their claims.

But Mr. Paterson said the situation was dire.

"I hope you're aware of the risks if we don't act," he told journalists at a midday news conference. "It is a systemic problem."

84.     Disclosure of the foregoing caused the price of AIG's 7.70% Series A-5 Junior Subordinated Debentures to decline from an offering price of $25 to a closing price of $4.73 on September 16, 2008.

## FIRST CAUSE OF ACTION

### Violations Of Section 11 Of The Securities Act
### Against All Defendants

85.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.  This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k. This claim is not based on fraud.

86.     This claim is brought by Plaintiff and on behalf of other members of the Class who purchased or acquired 7.70% Series A-5 Junior Subordinated Debentures pursuant or traceable to the Registration Statement and Prospectus.  Each Class member purchased or acquired their 7.70% Series A-5 Junior Subordinated Debentures pursuant or traceable to the Registration Statement and Prospectus.  AIG is the issuer of the 7.70% Series A-5 Junior Subordinated Debentures through the Registration Statement and Prospectus.  The Director Defendants are signatories of the Registration Statement.

24

87.     Defendants owed to Plaintiff and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

88.     None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

89.     Defendants issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of, material misstatements to the investing public contained in the Prospectus, which misrepresented or failed to disclose, inter alia, the facts set forth above.  By reason of the conduct alleged herein, each defendant violated Section 11 of the Securities Act.

90.     AIG, as issuer of the 7.70% Series A-5 Junior Subordinated Debentures sold in the Prospectus, is strictly liable to Plaintiff and the Class for the material misstatements and omissions discussed above.

91.     Director Defendants, as issuer of the 7.70% Series A-5 Junior Subordinated Debentures sold in the Prospectus, are strictly liable to Plaintiff and the Class for the material misstatements and omissions discussed above

92.     Each of the Underwriter Defendants was an underwriter of the 7.70% Series A-5 Junior Subordinated Debentures as that term is used in Section 11(a)(5) of the Securities Act.

93.     At the time Plaintiff and the Class obtained their shares of 7.70% Series A-5 Junior Subordinated Debentures, Plaintiff and the Class had no knowledge of the facts concerning the misstatements or omissions alleged herein.

94.     This action is brought within one year after discovery of the untrue statements and omissions in the Prospectus, and within three years of the effective date of the Prospectus.

95.     By virtue of the foregoing, Plaintiff and the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants and each of them, jointly and severally.

SECOND CAUSE OF ACTION

Violations Of Section 12(a)(2) Of The Securities Act

96.     Plaintiff repeats and re-alleges each and every allegation contained above as though fully set forth herein.

97.     This Count is brought for violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against the Underwriter Defendants, each of whom offered and sold AIG 7.70% Series A-5 Junior Subordinated Debentures, or solicited the sale of such securities to the Class in the IPO by means of the Registration Statement and Prospectus.

98.     The Registration Statement and Prospectus included untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

99.     Plaintiff and the members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement and Prospectus.

100.    The Underwriter Defendants named herein were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus to ensue that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  The Underwriter Defendants failed to make a reasonable investigation or possess reasonable grounds

for the belief that the statements contained in the Registration Statements and Prospectus were accurate and complete in all material respects.

101.    This claim has been brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after the 7.70% Series A-5 Junior Subordinated Debentures were sold to the Class in connection with the IPO.

102.    By reason of the misconduct alleged herein, Defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff and the members of the Class who purchased or acquired the 7.70% Series A-5 Junior Subordinated Debentures in the IPO, each of whom has been damaged as a result of such violations.

### THIRD CAUSE OF ACTION

### Violations Of Section 15 Of The Securities Act
### <u>Against Director Defendants</u>

103.    Plaintiff repeats and re-alleges each and every allegation contained above as though fully set forth herein.

104.    This cause of action is brought by Plaintiff pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class against the Individual Defendants.

105.    AIG is liable as an issuer under Section 11 of the Securities Act as set forth in the first cause of action herein.

106.    Each of the Individual Defendants was a control person of AIG with respect to the Offering by virtue of their positions as senior executive officers and/or directors of AIG.

107.    As a result, the Individual Defendants are liable under Section 15 of the Securities Act for AIG's primary violations of Section 11 of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment as follows:

(a)   declaring this action to be a Class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class, and certifying their counsel as Class Counsel;

(b)   awarding Plaintiff and other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

(c)   awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(d)   awarding Plaintiff and the Class such other and further relief as may be just and proper under the circumstances.

Dated: October 9, 2008

                    **GAINEY & McKENNA**


          By:    S/_____
                 Thomas J. McKenna
                 295 Madison Avenue, 4th Floor
                 New York, NY  10017
                 Telephone: (212) 983-1300
                 Facsimile: (212) 983-0383
                 Email:  tjmlaw2001@yahoo.com
                         tjmckenna@gaineyandmckenna.com

                 *Attorneys for Plaintiff*